Argued September 10, 1969, affirmed February 27, 1970

INVESTMENT SERVICE CO., *Appellant, v.*
MARTIN BROS. CONTAINER &
TIMBER PRODUCTS CORP.,
*Respondent.*
465 P. 2d 868

*Philip D. Chadsey,* Portland, argued the cause for appellant. With him on the briefs were Davies, Biggs, Strayer, Stoel and Boley and William M. McAllister, Portland.

*Edward M. Murphy,* Roseburg, argued the cause for respondent. On the brief were Stults, Jayne, Murphy & Anderson, Roseburg.

Before Perry, Chief Justice, and Sloan, O'Connell, Goodwin,* Denecke and Holman, Justices.

DENECKE, J.

The plaintiff, the assignee of the depositary bank, brought this action against the drawer of a dishonored check. The payee of a check made by the defendant drawer deposited the check in the depositary bank, which, in turn paid checks drawn by payee on its account against the balance created by the deposit of drawer's check. The drawer sent a timely stop-payment order to the payor bank who, therefore, refused to honor the check when the depositary bank sent the check to the payor bank for collection. This action is for the sum of $2,042.21, the amount the depositary bank paid out of the payee's account against the credit for drawer's check before that check was returned dishonored. The trial court held for the defendant and plaintiff appeals.

On May 22 the defendant, Martin Bros., drew a check on its account in a Tennessee bank, payable to the order of Quinco, Inc. The next day Quinco de-

---

* Goodwin, J., resigned December 19, 1969.

posited the check in its checking account in U. S. National Bank of Oregon (US). US sent the check through the Federal Reserve Bank system to the Tennessee drawee bank for collection. After deposit of the check and before its collection, US paid checks drawn by Quinco on its US checking account. Before presentment of the check to the Tennessee Bank, Martin Bros. ordered the Tennessee bank to stop payment of the check. The Tennessee bank did so and returned the check dishonored to US. US charged the amount of this check back against Quinco's account, which resulted in the account being overdrawn.

On June 8, in response to a request from Quinco, US sent the check to Quinco's attorney. The attorney requested the check so that he could commence an action for Quinco against the drawer, Martin Bros., on the check. There was no direct evidence of any agreement accompanying the delivery of the check to Quinco's attorney.

Quinco commenced an action on June 15 for the entire face amount of the check, $2,937. The complaint alleged that Quinco "now holds said check." Sometime thereafter Quinco became bankrupt and a trustee was appointed. Quinco's lawsuit was dismissed for lack of prosecution about six months after the judgment in the present case.

Shortly after Quinco filed its lawsuit, it executed and delivered to US a document entitled "Assignment." This was done entirely on the initiative of Quinco's attorney.

On September 20 Investment Service Co. commenced this litigation as assignee of US's interest in the check. Since US's rights in the check are deter-

minative here, we shall refer to US as plaintiff instead of Investment Service Co. Prior to the April trial of this litigation, US asked Quinco's attorney for the check. US received the check in March, and it was received in evidence in this litigation.

The principal issue in the case is whether the plaintiff bank can recover as a holder in an action on the check after it unconditionally returned physical possession of the check to the payee, with whom the check reposed at the time the bank commenced this action, and charged the check back to the payee's account.

When US initially received the check from Quinco, US became a "holder" of the check within the meaning of Oregon's Uniform Commercial Code (UCC). ORS 71.2010(20):

> " 'Holder' means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank."

US was in possession of the check and the check was properly indorsed. The payee, Quinco, did not indorse the check; however, ORS 74.2050(1) provides that the bank may make the indorsement for the customer.[1] The bank did make such indorsement in this case.

US initially proceeded upon the ground that it was a holder in due course and the defendant contested this status. On appeal, however, whether or not plaintiff is a holder in due course is immaterial because

---

[1] "A depositary bank which has taken an item for collection may supply any indorsement of the customer which is necessary to title unless the item contains the words 'payee's indorsement required' or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement."

defendant challenges only US's status as a holder and does not assert any defense which would relieve it of an obligation to pay an ordinary holder.

■ If US had retained possession of the check from the time the check was returned dishonored, US would have been able to recover from the defendant drawer.[⊚] The difficulty is created because US delivered the check to Quinco. The issue is whether US retained sufficient rights in the check to maintain this action.

Under §§ 51 and 191 of the Negotiable Instruments Law (NIL) (OCLA 69-401, 69-1101), the general law was that one could not maintain an action on a bill or note unless the plaintiff had possession of the bill or note. Annotation, 102 ALR 460, "Possession of bill or note as essential to maintain action thereon as 'holder.'" Section 191 of the NIL provided:

> "In this act, unless the context otherwise requires, * * * 'Holder' means the payee or indorsee of a bill or note who is in possession of it, or the bearer thereof. * * *."

Section 51 provides: "The holder of a negotiable instrument may sue thereon in his own name; * * *."

*Dolin v. Darnall*, 115 NJL 508, 181 A 201, 102 ALR 454 (1935), held that possession was essential. There, the plaintiff was an agent for the purpose of collecting the note.

Plaintiff did not have physical possession of the note at the time the lawsuit was commenced. The court held:

> "If, then, the notes were not delivered to the plaintiff, and if he was not the owner and holder

---

[⊚] Falls Church Bank v. Wesley Heights Realty, Inc., 6 UCC Rep Serv 1082 (DC Ct App 1969); Waltham Citizens National Bank v. Flett, 5 UCC Rep Serv 186, 234 NE2d 739 (Mass 1968).

of them at the time of the institution of the suit, he was not in possession of any cause of action which entitled him to institute the suit at that time, and hence the nonsuit granted on that ground was proper." 115 NJL at 510.

"The owner of an instrument who is not in possession cannot sue thereon for he is not the holder under section 51 nor a transferee under section 49." Britton, Bills and Notes, 184 (2d ed 1961).

Gilmore emphasizes the need for possession by the following illustration:

"* * * Take first the case of a negotiable instrument: if A wishes to make a transfer of the instrument to B, the only effective method is a delivery of the instrument to B. So long as B holds the instrument in pledge (assuming the transfer to have been for security), no one can acquire superior rights to the instrument or against the obligor through anything A may do. If, however, A, retaining possession of the instrument, delivers to B a written declaration that he has transferred the instrument to B and holds it as B's property, B's possession of the written declaration may give him rights against A but will not protect him against subsequent good faith purchasers of the instrument from A or against A's creditors and will not even give him the right to collect the instrument from the obligor. * * *." 1 Gilmore, Security Interests in Personal Property, § 1.2, 11 (1965).

US contends that whatever the law is in other jurisdictions, this court has decided that it is not necessary for the plaintiff to prove possession of the note. *Buckman v. Hill Military Academy,* 182 Or 621, 631-637, 189 P2d 575 (1948).

In that case the plaintiff brought an action on a promissory note which was payable to her. The evi-

dence was that the note had been executed by the defendant and delivered to plaintiff, and that she had at one time assigned the note for collateral but the note had been reassigned to her. One of the attorneys for plaintiff testified that he had the note in his possession when he prepared the complaint but he had lost it.

The court held that because of the evidence that the note had been reassigned to plaintiff and the evidence excusing nonproduction of the note, a prima facie case had been made that plaintiff was the holder. The court so reasoned because of its belief that plaintiff could have maintained an action as a holder if the note had still been pledged and the pledgee had consented to the bringing of the action. The court also considered the problem in the evidence category of lost documents and not as a uniquely negotiable instruments problem.

Because the note might have been found by someone else who might bring an action on the note, the court stated the defendant would be entitled to be indemnified by plaintiff against such possible loss by defendant.

Lost instruments were treated under the NIL as an exception to the rule that possession is a prerequisite to recovery:

> "* * * While a person out of possession normally cannot sue on the instrument, an exception exists in favor of the holder or owner who lost the instrument or from whom it was stolen. The holder of a lost instrument may sue thereon." Britton, supra, at 184.

The UCC has a provision which was not in the NIL which covers the facts in the *Buckman* case.

> "The owner of an instrument which is lost,

whether by destruction, theft or otherwise, may maintain an action in his own name and recover from any party liable thereon upon due proof of his ownership, the facts which prevent his production of the instrument and its terms. The court may require security indemnifying the defendant against loss by reason of further claims on the instrument." ORS 73.8040.

We do not find the *Buckman* decision controlling. The plaintiff here is not a pledgor with a consenting pledgee and the check in this case was not lost but was in the hands of the payee who had commenced an action on the note against the defendant.

We consider another decision of this court, distinguished in the *Buckman* case, to be more closely applicable. *Tillamook County Bk. v. International Co.*, 106 Or 339, 211 P 183, 211 P 941 (1923). In that case the plaintiff was the payee and the defendant was the drawee of the bills of exchange. The complaint alleged that plaintiff was the owner and holder. Two of the bills were never offered in evidence and no evidence was offered of their whereabouts. The court cited the NIL definition of holder and held:

"Without producing the instruments in question and offering them at the trial, and without offering any testimony tending to show that the bank was in possession or was entitled to the possession of them, there was nothing before the court to show that plaintiff was entitled to maintain an action thereon. Production of the bills of exchange or an accounting for their absence was necessary to establish plaintiff's right of action as well as to protect the defendant from the possibility of being compelled to pay them a second time." 106 Or at 357.

The court also stated that if the instrument was not produced, the plaintiff must account for and excuse

its nonproduction. This is the basis upon which the court in *Buckman v. Hill Military Academy*, supra (182 Or 621), distinguished the *Tillamook Bank* case.

The UCC, ORS 71.2010(20), before quoted, is not identical to the NIL § 191; however, both define a holder as one in possession. Similarly, the UCC is not identical to § 51 of the NIL; however, both provided that the holder may enforce payment in his own name. ORS 73.3010.

The UCC is probably more exacting on the requirement of possession as a prerequisite than was the NIL. As stated, the NIL provides that to begin an action under usual circumstances one must be a holder and to be a holder one must be in possession. Although no exceptions to this principle were expressed in the NIL, the courts made exceptions such as in the case of a lost or pledged instrument. The UCC does contain an express exception to the requirement that one must have possession of an instrument to maintain an action thereon. That exception is ORS 73.8040, above quoted, providing that an owner of a lost instrument can maintain an action upon the instrument if he can prove the instrument is lost. Under the usual rules of statutory construction the specification of one exception to the requirement of possession leads to a construction of the entire statute that no other exceptions to the requirement of possession are intended. This construction is fortified by the official comment to ORS 73.8040:

> "*Purposes:* ORS 73.8040 is new. It is intended to provide a method of recovery on instruments which are lost, destroyed or stolen. The plaintiff who claims to be the owner of such an instrument is not a holder as that term is defined in the Uniform Commercial Code, since he is not in posses-

sion of the paper, and he does not have the holder's prima facie right to recover under ORS 73.3070 on the burden of establishing signatures. He must prove his case. He must establish the terms of the instrument and his ownership, and must account for its absence." See Legislative Counsel Committee pamphlet on Oregon's Uniform Commercial Code with Comments, at 194 (1962).

That part of the comment that is particularly significant is that the owner of a lost instrument is not a "holder" because he is not in possession. Also, if one is not in possession for some cause other than because the instrument is lost he cannot be a "holder." Except for ORS 73.8040, just referred to, and other provisions not here material, one cannot maintain an action upon the instrument if he is not a "holder." Thus, possession of the instrument is a prerequisite to maintaining an action on it with the sole exception here material of ORS 73.8040. This exception is clearly of no avail to plaintiff.

Two reasons are the probable basis for the requirement of possession. The most important is the danger of exposing the drawer to double liability if the drawer is required to pay one who does not have physical possession of the note.

This reasoning was the basis for our decision in *Hobgood v. Sylvester*, 242 Or 162, 408 P2d 925 (1965). There, the plaintiff brought an action against nonresident defendants. Plaintiff sought to acquire quasi-in-rem jurisdiction by attaching a debt owed defendants by Oregon residents. The note evidencing the debt could not be attached or brought under the attaching officer's control because the note physically reposed in California, beyond the sheriff's power. We held the attachment was ineffective, stating:

"* * * We believe that when a debt has been

evidenced by such an instrument, because of the peculiar incidents of negotiability the debt cannot be attached effectively without bringing the instrument under the court's control. The reason given for this rule in other jurisdictions is that without obtaining control of the instrument, the court cannot protect the maker against double liability. * * *." 242 Or at 167-168.

In the instance of an instrument claimed lost, the comment to ORS 73.8040, concerning lost instruments, states: "If the claimant testifies falsely, or if the instrument subsequently turns up in the hands of a holder in due course, the obligor may be subjected to double liability."

In the instant case payment by the defendant to US at the time US instituted this action could have resulted in double liability for Martin Bros. Payment to US would not have been a bar to Quinco's recovery on the check based upon Quinco's then existing rights as a holder. Since Quinco was the payee, it could, upon reacquisition of the check, strike all the endorsements. ORS 73.2080.[9] In that event, US would no longer be a holder, not only because US no longer had possession, but also because the check was no longer endorsed to US. To be a holder, the instrument must be "issued or indorsed to him [the person claiming to be a holder] or to his order or to bearer or in blank." ORS 71.2010(20). Payment to US would not be payment to a holder pursuant to ORS 73.6010 or 73.6030

---

[9] ORS 73.2080: "Where an instrument is returned to or reacquired by a prior party he may cancel any indorsement which is not necessary to his title and reissue or further negotiate the instrument, but any intervening party is discharged as against the reacquiring party and subsequent holders not in due course and if his indorsement has been canceled is discharged as against subsequent holders in due course as well."

and, therefore, payment to US would not discharge the drawer.

US would be considered to be a prior holder with respect to Quinco after Quinco reacquired the check by transfer from US. Professor Britton stated the law under the NIL to be: "Payment to a prior holder does not operate as a discharge of the instrument unless such former holder, independent of the fact that he was such, had been authorized by the holder to receive payment on his behalf." Britton, supra, at 647. There is no evidence that Quinco authorized US to receive payment on Quinco's behalf.

This remains the law under the UCC.[4]

In addition, one in the position of Quinco at the outset of this litigation could negotiate the note to

[4] ORS 73.3010: "The holder of an instrument whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in ORS 73.6030 on payment or satisfaction, discharge it or enforce payment in his own name."

ORS 73.6030: "(1) The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument unless prior to such payment or satisfaction the person making the claim either supplies indemnity deemed adequate by the party seeking the discharge or enjoins payment or satisfaction by order of a court of competent jurisdiction in an action in which the adverse claimant and the holder are parties. This subsection does not, however, result in the discharge of the liability:

"(a) Of a party who in bad faith pays or satisfies a holder who acquired the instrument by theft or who (unless having the rights of a holder in due course) holds through one who so acquired it; or

"(b) Of a party (other than an intermediary bank or a payor bank which is not a depositary bank) who pays or satisfies the holder of an instrument which has been restrictively indorsed in a manner not consistent with the terms of such restrictive indorsement.

"(2) Payment or satisfaction may be made with the consent of the holder by any person including a stranger to the instrument. Surrender of the instrument to such a person gives him the rights of a transferee as provided in ORS 73.2010."

a holder in due course.[9] In that event, the holder in due course could have enforced the check against the drawer (ORS 73.3050) and the fact that the drawer had already paid US would not have prevented recovery by the holder in due course. ORS 73.6010, 73.6020.

The other reason for the requirement of possession as a prerequisite to recovery on a negotiable instrument is the necessity for simplicity and clarity in the law of commercial paper in order to facilitate commercial dealings. The basic principle of commercial dealings in negotiable instruments is that one who presents an instrument which on its front and back establishes the right of payment is entitled to be paid and one who cannot make such a showing is not entitled to be paid. Exceptions to this should be rare; the UCC expresses only one, ORS 73.8040, concerning lost instruments.

"* * * One of the most deeply rooted principles in our law of negotiability is that the only way in which an interest in a negotiable instrument can be effectively transferred is by physical delivery of the instrument, accompanied by any necessary indorsements. This principle means, with respect to security transactions in negotiable instruments, that the only available device is pledge; so long as the pledgee keeps the instrument in his possession, no competing claim entitled to priority can arise.

"This clear and simple state of law would have been seriously disturbed if the nineteenth century courts had held negotiable instruments within the

---

[9] Under the circumstances of this case any person acquiring the check from Quinco after Quinco reacquired it might be held to have notice that the check was dishonored because of the state of the indorsements and cancellation of the indorsements on the back of the check. However, since Quinco had a right to cancel all these indorsements, ORS 73.2080, this may not be the case. We need not here, and do not, decide this question.

coverage of the chattel mortgage acts, so as to allow creation and perfection of a nonpossessory security interest in, say, a promissory note. * * *."
2 Gilmore, Security Interests in Personal Property, § 25.1, 658 (1965).

We hold that under the UCC, as well as the NIL, the plaintiff must prove the instrument is in its possession if it is not shown to be lost.

Plaintiff's further contention is that Quinco had possession of the instrument on behalf of plaintiff, i.e., the US had constructive possession of the check. As stated, it is questionable under the UCC whether constructive possession is sufficient. Plaintiff relies on *National Bank v. American Brewing Co.*, 79 Mont 605, 257 P 1043 (1927). In that case the pledgee of the note was allowed to recover upon the note although possession of the note was retained by the pledgor. The court pointed out, however, that the pledgor held possession for the purposes of collection and "possession of the note by the * * * [pledgor-payee] was clearly the possession of the plaintiff and its predecessor." 79 Mont at 613. In the instant case Quinco was not holding possession of the check for US. When the branch manager of US returned the check to Quinco's attorney he wrote that the check was "charged back to Quinco's account June 1, 1967." These words do not give the connotation that the bank was transmitting the check for collection. The charge back to the payee's account indicates that the US was looking to the payee or the payee's funds in the account for payment. (As previously stated, Quinco was the holder of the check at the time this lawsuit by US was commenced.)

US further contends that it had a sufficient interest in the instrument to maintain this action because

of the assignment which Quinco had delivered to US after Quinco had commenced its action against the defendant. The only explanation of the reason for the assignment is the testimony of the attorney for Quinco who stated:

"Well, somehow I learned, after we had filed suit and I think it was after I had already taken deposition and advanced costs on the matter, that the bank had an interest in the check, had paid funds above and beyond; in other words, it wasn't just a charge against my client's account but they had actually paid it and overdrawn his account and I was advised, I think, by Mr. John Huisman [US's attorney] of this fact and he advised me they were a holder in due course as to that sum and I didn't dispute it; so I attempted—I didn't want to lose my costs and my time and hoped that I could proceed representing the bank and so I drafted an assignment and agreed with them that they were entitled to that much proceeds from it and I think I mailed it to both the bank and to the law firm."

Quinco's intent was not to assign to US the right to bring an action against the maker on the check.[9] By the assignment Quinco conveyed to US a partial interest, to the extent of $1,823.23, in "the net proceeds recovered by the legal action against Martin Bros. Container and Timber Products Corp. by Quinco, Inc." Quinco had already commenced an action for the full face amount of the check, $2,937, and it continued to pursue that action in that amount after the assignment and the commencement of this action by US. Quinco's attorney delivered the check to US just before the trial of this lawsuit upon the condition that

[9] Even if that had been Quinco's intent, it is doubtful whether US could maintain an action against the maker without having possession of the check. 1 Gilmore, supra.

it would return the check to Quinco for use in its lawsuit against the defendant. Quinco's action was not dismissed until January 1969.

In *State Farm Mutual Auto. Ins. Co. v. Pohl*, 255 Or 46, 464 P2d 321, decided January 21, 1970, we held that a clause creating a right in the insurer to the proceeds of any settlement made or judgment obtained by the insured did not create any right in the insurer against a debtor-tortfeasor. That was not a negotiable instrument case. In the field of negotiable instruments there is even more reason to hold that an assignment of the proceeds of a cause of action does not give the assignee a right to enforce the claim directly against the obligor.

Acceptance of plaintiff's contention would necessarily allow one to maintain an action as a holder on a promissory note solely upon the basis of having been assigned a portion of the proceeds of any judgment recovered in an action by another on that note; the plaintiff would not be required to have the cause of action on the note assigned nor have possession of the note transferred from the assignor to the assignee. Such a result would necessarily rest upon the proposition that either the assignee or the assignor or both could successfully sue on the note.

Lastly, US contends that at the time of the trial it was a holder having physical possession of the check and that the time of trial, rather than the time of the commencement of the action is the relevant time. US did have possession at the time of trial; however, we conclude that the relevant time was the commencement of the action.

*Dolin v. Darnall*, supra (115 NJL 508), expressly held that possession of the negotiable instrument at the commencement of the action was essential and it

was not sufficient that the plaintiff subsequently obtained possession by the time of trial. *Johnson v. United Securities Corporation,* 194 A2d 132 (DC App 1963), followed *Dolin v. Darnall,* supra (115 NJL 508):

> "Without proof that appellee was in possession of the note at the time it commenced the action, it could not maintain the action as a holder of the note. Regaining possession of the note after commencing the action would not cure the defect. * * *." 194 A2d at 133.

On the other hand, Professor Britton states: "It is probably sufficient if the plaintiff is the holder at the time of trial." Britton, supra, at 184. In support of this proposition, he cites *Newell v. Rosenberg,* 275 Mass 455, 176 NE 616 (1931), where the payee was allowed to recover on notes against the makers even though the notes were in the hands of an indorsee at the time of the commencement of the action. The court held that "[t]he production of the notes at the trial was prima facie *evidence* that the plaintiff had a *right to sue on the day of commencement of the action.*" 275 Mass at 461. (Emphasis added.)

The *Newell* case is not in point here because at the time the instant case was instituted, Quinco was pursuing an action solely in its own behalf as the holder of the note and thus no prima facie case could be made that US had a right to sue on the day of the commencement of the action. The *Newell* decision was apparently based on the conclusion that the plaintiff brought the action in cooperation with the indorsees.

■ Our decisions are to the effect that a cause of action or suit must exist at the commencement of the litigation and litigation is premature if a necessary element of the cause of action does not occur until after the commencement of the action. We have not

found an articulation of the reasons for such policy but presume that it is to discourage speculative litigation. This policy is expressed in *City of Reedsport v. Hubbard,* 202 Or 370, 385, 274 P2d 248 (1954):

> "If defendant was not in default in the performance of the contract on his part to be performed on September 9, 1943, when the instant suit was commenced, then no cause of suit existed in favor of plaintiff. Subsequent events giving rise to a cause of suit in favor of plaintiff could be of no avail in the present proceeding. If at the time this suit was commenced, no cause of suit had accrued, then the suit was prematurely commenced and should have been dismissed."

Accord, *Clark v. Morrison,* 80 Or 240, 245, 156 P 429 (1916).

Affirmed.

O'CONNELL, J., dissenting.

The record shows that plaintiff introduced the check into evidence at the time of the trial. It is clear, then, that the bank was the holder of the check at that time. And I understand that the majority of the court would concede that the bank could have brought the action if the check had come into its possession prior to the commencement of the action. So the decision in this case is made to rest solely upon the extremely technical ground that the elements of a cause of action must exist at the commencement of the action and the defect is not cured by evidence at the trial which supplies the missing element in the cause of action.

Whatever may be said in defense of this rule, I do not think that it should be applied when it is asserted by the defendant for the first time on appeal. If defendant had set up this defense at the time of

trial, plaintiff would simply have refiled his action and the cause of action would have then been good. As it is, plaintiff is denied relief on appeal on technical grounds which plaintiff can readily circumvent by filing a new action and, as I understand the majority opinion, plaintiff will be entitled to recover as a holder of the check.

PERRY, C. J. joins in this dissent.