Argued and submitted June 22, affirmed November 16, 1994

# WEGROUP PC / ARCHITECTS AND PLANNERS,
*Appellant,*

*v.*

# STATE OF OREGON,
*Respondent.*

## (16-92-08580; CA A81256)

885 P2d 709

Joel S. DeVore argued the cause for appellant. With him on the briefs was Luvaas, Cobb, Richards & Fraser, P.C.

Jas. Adams argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

HASELTON, J.

### HASELTON, J.

In this action, brought by an architectural firm seeking payment for work performed for the State of Oregon in connection with remodeling what is now the Eastern Oregon Correctional Institute (EOCI), the trial court granted the state's motion for partial summary judgment. Plaintiff appeals from the resulting judgment pursuant to ORCP 67B, and we affirm.

In 1982, faced with a shortage of prison cells in Oregon, the legislature appropriated $9 million to convert the Eastern Oregon Hospital and Training Center into a prison. The project was to be completed in stages; initially, only the east side of the facility would be converted. The Corrections Division, as the responsible agency, hired plaintiff Wegroup PC Architects and Planners to provide architectural and related services needed for that portion of the project.

In 1987, the governor directed that the completion of the western half of the EOCI project, which would provide an additional 761 spaces, should be expedited. On March 10, 1987, the Corrections Division contracted with plaintiff to provide architectural services for the western renovation.

The western renovation contract provided that plaintiff would complete its work in four phases—a site analysis phase, a schematic design phase, a design development phase, and a construction documents phase—and would complete each phase according to an expedited and extremely rigorous schedule.[1] Plaintiff was to receive a lump sum fee of $843,100 for completing all four phases.

Plaintiff began work immediately. Between May 1987 and November 1988, plaintiff and the state entered into eight written amendments to the contract. Each amendment required plaintiff to perform services not covered by the original contract and increased plaintiff's fee accordingly.

In early 1988, the events giving rise to this litigation occurred: The state changed its mind about a portion of the west wing, Unit C, which had originally been designed solely as an activity space, and directed plaintiff to redesign the unit

---

[1] The contract was later amended to add a bidding phase and a construction contract administration phase.

for flexible use either as cells or as activity space. Although the parties agree that the services involved in redesigning Unit C went beyond those contemplated under the original contract, it appears that neither party attempted to negotiate or modify the contract price *before* those additional services were performed. Nor is there any documentation in the summary judgment record, memorializing any agreement of the parties to defer negotiation or contractual modification with respect to the Unit C redesign. The record discloses only that plaintiff complied with the request and later submitted bills for the redesign work to the state.

When the state refused to pay those bills or negotiate a price for the additional services, plaintiff brought this action. Plaintiff's claims included multiple counts of breach of contract, based on allegations that the state: (1) requested services beyond those contemplated by the written contract; (2) refused to negotiate for those additional services; (3) violated its duty of good faith and fair dealing by failing to draft a contract amendment regarding the additional services; and (4) violated an implied promise to pay for the additional services.[2]

The state moved for summary judgment on those claims. It argued that, as a matter of law, it was not obligated to pay for the additional work because the necessary approvals to enter into a contract amendment for those additional services had never been obtained. The trial court granted the state's motion, and plaintiff appeals the resulting ORCP 67B judgment.

■     Summary judgment is properly granted when the moving party establishes that there is no issue as to any material fact and that it is entitled to judgment as a matter of law. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978). Here, plaintiff and the state agree about the content of their contract, and further agree that the redesign of Unit C exceeded the work contemplated in that contract. We consider the legal sufficiency of plaintiff's contractual claims in light of those undisputed material facts.

---

[2] The complaint also included a breach of contract claim based on the state's alleged failure to reimburse certain "claim check fees," several unjust enrichment claims, and a claim seeking reformation of the contract. None of those claims were adjudicated in the ORCP 67B judgment that is the subject of this appeal.

■        Plaintiff first asserts that the state breached the contract by ordering plaintiff to redesign Unit C. That conduct, plaintiff maintains, violated the state's contractual duty to refrain from imposing extra work by revisiting and changing phases of work that had already been approved. Such a duty, plaintiff argues, derives from the phased structure of the contract, which required the state to "sign off" on plaintiff's work at the end of each phase. In plaintiff's view, adoption of that phased structure implied that the state would not request changes in work that had already been approved.[3] In addition, plaintiff reads one contractual term, which states that "[t]he Architect shall be entitled to rely upon the accuracy and completeness of the services, information, surveys and reports furnished by the Division," as a promise by the state to adhere to its phased approvals.

Assuming, but not deciding, that the state breached some contractual duty by merely requesting the Unit C redesign, any recovery for such a breach is barred, as a matter of law, by plaintiff's own failure to comply with contractual, statutory and regulatory requirements before performing the additional work. In particular, if the state's demand for the redesign of Unit C did, in fact, materially alter the scope and expense of plaintiff's services, plaintiff was obligated to refuse to proceed until an appropriate contract amendment had been negotiated and approved in writing by all parties. Section B.1.02 of the parties' contract provides:

> "The Division reserves the right to accept or reject the Architect's plans at the end of each phase and to require the Architect to change or modify such plans at any time prior to their acceptance. Design of bid alternatives is not considered to be a major factor in the scope of this Project. *In the event alternative designs substantially change the scope of the Architect's Contract, the Architect's fee for such change shall be negotiated with the Division and work shall commence only after the Contract has been amended in writing and approved by all parties*." (Emphasis supplied.)

---

[3] That duty, plaintiff argues, stands in contrast to the state's right, explicitly reserved under the contract, to "accept or reject the Architect's plans *at the end of each phase* and to require the Architect to change or modify such plans at any time *prior to their acceptance*." (Emphasis supplied.)

That requirement accords with ORS 279.712, which provides that the Department of Administrative Services

> "shall approve all professional and personal services contracts of agencies for architectural, engineering, and related services *before any such contract becomes binding and before any service may be performed under the contract.*" (Emphasis supplied.)

Finally, Corrections Division rules reiterate and expand on the statutory approval requirement of ORS 279.712. OAR 291-26-025 provides, in part:

> "(6)  All contracts must be approved first by the Department [of Corrections] then Executive Department and/or the Department of General Services *before any work can begin.*

> "(7)  Amendments to change the scope of work, extensions of time, or any other change in contract substance or language will be processed in the same manner as the original document." (Emphasis supplied.)

We recognize that plaintiff may have been concerned that a refusal to comply immediately with the state's request would have interfered with its ability to meet the demanding timelines for completion of the western half of the EOCI renovation. However, the statutory, regulatory, and contractual requirements governing confirmation, negotiation and approval of contractual "scope of work" amendments are clear, and plaintiff did not comply with those provisions.

■     Plaintiff argues, alternatively, that, under section B.1.02 of the contract, *supra*, the state assumed an affirmative duty to negotiate amendments when it requested a substantial change in the scope of work. Plaintiff contends that the state violated that duty by failing to initiate negotiations at the time of its request. The state concedes that if plaintiff had initiated negotiations, it would have been obligated to bargain the terms of the additional work in good faith. The state reasons, however, that, because plaintiff never initiated negotiations, it breached no duty to bargain over the putative contract amendment.

We agree with the state. Section B.1.02 is phrased in the passive voice: "The Architect's fee for such work shall be negotiated with the Division." That language does not impose an affirmative duty to *initiate* negotiations on either party.

Instead, it requires each party to negotiate at the other's request.

There is no direct evidence that plaintiff attempted to initiate negotiations before it commenced work on the Unit C redesign. Nor does the record support a reasonable inference that such an attempt was made. Accordingly, the state did not breach the parties' contract by failing to negotiate a fee for the requested change in the scope of the work.

■ Plaintiff's final breach of contract theory asserts a breach of the duty of good faith implied, which is in the performance of every contract. *Best v. U.S. National Bank*, 303 Or 557, 561, 739 P2d 554 (1987). Plaintiff contends that the state breached that duty by failing to prepare an amendment to accommodate the extra work it had requested and by failing to submit that amendment for necessary approvals.

"[T]he good faith doctrine [seems] to effectuate the reasonable contractual expectations of the parties." *Best v. U.S. National Bank, supra*, 303 Or at 563. Here, plaintiff argues that, given the parties' interdependent relationship, the contract's compressed time schedule, and the state's "custom and practice" of preparing and executing contract amendments *after* work on the requested changes had begun, it could reasonably expect that the state would execute an amendment after plaintiff began work on the Unit C redesign.

Plaintiff's evidence of the state's alleged previous practice of drafting and executing "after the fact" contract amendments was limited to a single reference in the affidavit of its office manager:

> "In the course of the contract * * *, we had eight written amendments, some of which came several months after the State requested a change. The State's practice was to later document written amendments which the State had verbally authorized. Wegroup relied on that custom and practice in this instance."

That statement does not describe the circumstances of the eight amendments with any particularity, much less indicate in which, if any, of those instances the state prepared and executed contract amendments after the work was commenced, as it was here.

■ Even if we were to assume that the office manager's statements could support an inference of a prior course of *post hoc* authorization, plaintiff's good faith theory would still fail as a matter of law. The obligation of good faith cannot vary the substantive terms of a contract or pertinent statute, or provide relief from an act that is expressly permitted by contract or statute. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 352-53, 876 P2d 761(1994); *Sheets v. Knight*, 308 Or 220, 233, 779 P2d 1000 (1989). Here, any implication of a "good faith" duty on the state's part to amend the contract *after* work on the Unit C redesign had commenced would be irreconcilable with section B.1.02, *supra,* which requires all amendments pertaining to plaintiff's fee to be written and approved *before* the relevant work commences. Such a duty would also be flatly inconsistent with the applicable public contracting statutes and rules, *supra,* which require the Department of Administrative Services to approve all contracts for architectural services *before* such services are performed for a state agency.

Plaintiff argues, nevertheless, that there is no inconsistency between the asserted good faith duty and express contractual, regulatory, and statutory requirements because the state waived compliance with those requirements through its "custom and practice" of executing written amendments after orally requesting and approving additional work. Whatever the merit of plaintiff's waiver argument with respect to the requirements of section B.1.02, the Corrections Division's conduct could not waive compliance with applicable public contracting statutes and rules. As we said in *Harsh Investment Corp. v. State Housing Division*, 88 Or App 151, 158, 744 P2d 588, *rev den* 305 Or 273 (1987), when confronted with a similar argument that a state agency had waived a contracting requirement embodied in an administrative rule:

> "Those who deal with state officers must know the extent of their authority and cannot claim by estoppel what they could not receive by contract. * * * Neither can [a state agency] waive a legal prerequisite to its actions; to permit it to do so would render meaningless the statutory procedures for suspending a rule."

The same analysis applies doubly here, where the asserted "waiver" would nullify not just a regulation, OAR

291-26-025, but also its predicate statute, ORS 279.712. Thus, plaintiff's "good faith" claim fails.

■      Plaintiff next assigns error to the entry of summary judgment against its alternative theory that the state breached an implied promise to pay for the additional work it requested. Plaintiff distinguishes its implied promise claim from a typical *quantum meruit* claim, which would allege an obligation arising *outside* of an express contract,[4] and characterizes it as a request to read a price term into its *existing* contract with the state:

> "[T]he State frustrated the negotiation term of the contract, which required the State to bargain and formalize its request for added work. Because [plaintiff] had contracted to do all the design from the beginning to the end, the architects could not blithely refuse the State's directions. Therefore, an implied-in-fact promise arose in the existing contract to pay the reasonable value of the services requested and rendered."

That claim fails for many of the same reasons that foreclose plaintiff's other, more conventional contract theories. The laws prescribing the manner of public contracting circumscribe the state's ability to bind itself by express contract. Those laws apply equally to the formation of alleged implied contracts:

> "The general doctrine unquestionably is that when one receives the benefit of another's work or property, he is bound to pay for the same, and this doctrine applies as well to [public] corporations as to individuals in cases where there is no restriction imposed by law upon the [public] corporation against making in direct terms a contract like the one sought to be implied; but where there exist legal restrictions which disable a [public] corporation to agree in express terms to pay money, the law will not imply any such agreement against the corporation." *Twohy Bros. Co. v. Ochoco Irr. Dist. et al*, 108 Or 1, 33, 210 P 873 (1923) (quoting *Springfield Milling Co. v. Lane Co.*, 5 Or 265, 267 (1874)). *Accord White v. City of Seaside*, 107 Or 330, 213 P 892 (1923); *Harsh Investment Corp. v. State Housing Division, supra*, 88 Or App at 155-56.

That rule places rigorous burdens of compliance on persons and entities in plaintiff's position and may, on occasion,

---

[4] *Kashmir v. Patterson*, 289 Or 589, 593, 616 P2d 468 (1980).

compel seemingly — or actually — draconian consequences. But that is the statutorily imposed price of doing business with a public body. *Forrester v. City of Hillsboro*, 156 Or 89, 91, 66 P2d 496 (1937) ("the protection of the public against fraudulent and improvident contracts is paramount").[5] Persons who enter into public contracts are deemed to know the laws governing such contracts, and they assume the risk of nonpayment if they perform without insisting on strict compliance with those laws.

Affirmed.

---

[5] Plaintiff argues that *Barbour & Son v. Highway Com.*, 248 Or 247, 433 P2d 817 (1967), and *City of Portland v. Hoffman Const. Co.*, 286 Or 789, 596 P2d 1305 (1979), in which the Supreme Court allowed plaintiffs to bring actions against public bodies, based on implied promise theories, are contrary to the outcome in this case. However, those cases are materially different in that they do not involve a public body's failure to comply with laws restricting the formation of public contracts. *See Washer v. Clatsop Care and Rehab. District*, 304 Or 3, 7-9, 741 P2d 493 (1987).