Argued and submitted March 15, affirmed July 7, petition for review denied December 14, 1999 (329 Or 553)

Bruce L. RICHARDSON, D.M.D.,
*Appellant,*

*v.*

The GUARDIAN LIFE INSURANCE COMPANY
OF AMERICA
and Clifford A. Bailey,
*Respondents.*

(9608-06418; CA A101063)

984 P2d 917

Albert J. Bannon argued the cause for appellant. With him on the briefs were Tara J. Schleicher and Farleigh, Wada & Witt, P.C.

R. Daniel Lindahl argued the cause for respondent The Guardian Life Insurance Company of America. With him on the brief were Robert B. Miller and Bullivant, Houser, Bailey.

Ruth C. Rocker argued the cause for respondent Clifford A. Bailey. With her on the brief were Janet M. Schroer and Hoffman, Hart & Wagner.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

## BREWER, J.

Plaintiff appeals from summary judgment for defendants on each of his multiple tort, contract, statutory, and other claims in this action relating to the interpretation of two business overhead disability insurance policies. Defendants are his insurer and insurance agent. Plaintiff's overarching contentions are that the trial court erred in dismissing his primary claims that the policies covered overhead expenses incurred after he sold his dental practice or, alternatively, that the insurer is estopped from denying coverage after its agent stated that coverage existed. Therefore, plaintiff asserts that his other claims, each of which depends heavily on one or the other of his primary claims, remain viable as well. For the reasons that follow, we affirm.

■ On appeal from summary judgment, we view the facts and all reasonable inferences drawn from those facts in the light most favorable to plaintiff, the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). Plaintiff was the sole shareholder of Bruce L. Richardson, D.M.D., P.C. (the corporation), the professional corporation through which he practiced dentistry. In 1987, plaintiff purchased two business overhead expense policies from defendant, The Guardian Life Insurance Company of America (Guardian), through an insurance agent, defendant Clifford Bailey. Each policy covered up to $2,000 per month in overhead expenses of plaintiff's business should he become disabled. The policies identically defined covered expenses as follows:

"Covered expenses mean regular business expenses:

"• which you normally incur in the conduct of your business or profession;

"• which require a cash payment; and

"• which the United States Internal Revenue Service accepts as tax deductible business overhead expenses.

"As part of your proof of loss while you are disabled, you must give us a written statement of the covered expenses you incur each month."[1]

---

[1] The policies each provided the following examples of covered expenses:

Each policy defined "total disability" as the inability "to perform the major duties of your occupation." The policies also provided that the insured "may" cancel should he or she discontinue practice. According to a pamphlet accompanying the policies to qualify for coverage, the insured either was required to own 20 percent of the practice or to "have a contractual obligation" to pay the overhead expenses of the business.

In March 1996, plaintiff's health began to deteriorate. In April of that year, he entered into negotiations to sell all of his stock in the corporation to one of its employees, Dr. Keys. Plaintiff retained an experienced and qualified attorney to advise him and to document the transaction. By May 8, plaintiff was no longer able to work as a dentist and was totally disabled within the meaning of the policies. In early May, Keys became concerned that she would not be able to pay all of the overhead expenses of the corporation while she was building up her clientele. Plaintiff informed Bailey of the plan to sell his practice, and plaintiff claims that Bailey told him that the policies might cover his overhead expenses. Plaintiff's attorney analyzed the policies and provided plaintiff with legal advice concerning the prospects for coverage of overhead expenses under the policies following the sale of plaintiff's stock. On May 20, plaintiff's attorney asked Bailey whether the policies would cover the overhead expenses under those circumstances. According to plaintiff's attorney, Bailey told him that the policies would provide that

---

"Covered expenses include but are not limited to the following:

"• rent, or mortgage and realty tax payments, on space you occupy and use as business premises;

"• salaries of employees, including employer contributions for FICA taxes and qualified benefit programs, except as excluded below;

"• utilities;

"• installment payments for furniture and equipment;

"• premiums for business insurance, except as excluded below;

"• accounting, billing and collection fees;

"• fees for business or professional licenses;

"• association or trade dues and subscriptions;

"• postage;

"• business laundry; and

"• janitorial and maintenance services."

coverage. The attorney recommended that plaintiff enter into the stock purchase agreement, including a provision binding plaintiff to pay one year's overhead expenses. Plaintiff and Keys executed the agreement on or about May 23. The agreement was expressly made retroactive, effective May 8. On June 25, plaintiff submitted a notice of disability claim to Guardian under the policies. The notice stated that plaintiff had been disabled since May 8. Guardian denied coverage, and plaintiff filed this action to recover damages, including the overhead expenses that he agreed to pay on behalf of Keys.

Plaintiff made six claims against Guardian. Those claims allege breach of contract, estoppel to deny coverage, unfair claim settlement practices, bad faith denial of coverage, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. Plaintiff sought damages and attorney fees as remedies. Plaintiff alleged three claims against Bailey, including negligence, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress. Guardian filed its first motion for summary judgment against the breach of contract and estoppel claims. The trial court granted summary judgment on the breach of contract claim but initially denied summary judgment on the estoppel claim. Guardian later filed a second motion for summary judgment, this time challenging the unfair claims settlement practices, bad faith denial of coverage, breach of the covenant of good faith and fair dealing, and attorney fees claims. The trial court granted Guardian's second summary judgment motion as to all claims moved against except the attorney fee claim. Finally, Guardian filed a third motion for summary judgment on plaintiff's remaining claims, including estoppel and intentional infliction of emotional distress. Bailey also moved for summary judgment on each of plaintiff's claims against him. The trial court granted the motions in their entireties and entered final judgment dismissing all of plaintiff's claims.

Plaintiff's first assignment of error contests the trial court's conclusion that the policies did not cover his claim for business overhead expenses and, therefore, that Guardian's denial of coverage was not a breach of contract. Guardian

argues that the trial court correctly concluded that there was no coverage, because the policies only covered expenses *plaintiff* incurred in *conducting* his business or profession. Guardian asserts that the claimed expenses were incurred in Keys' business at a time when plaintiff no longer conducted a business. Plaintiff counters that the policy language is ambiguous and that the phrase "which you normally incur in the conduct of your business or profession" must be examined in light of the policies as a whole. Plaintiff argues that the term "business or profession" applies to his circumstances because, consistent with the example in the policy pamphlet, he remains contractually obligated to pay Keys' overhead expenses. He also relies on the policies' definition of "total disability":

> "Total disability means that, because of sickness or injury, you are not able to perform the major duties of your occupation.
>
> "*Occupation* means your regular occupation or profession *at the time you become totally disabled.*" (Emphasis added and in original.)

Plaintiff argues that he was a dentist at the time he became totally disabled and, therefore, that he was not required to practice his profession during the period when covered expenses were incurred.

The interpretation of an insurance policy is a question of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992). The primary rule of construction in an insurance contract

> "is to ascertain the intention of the parties. * * * We begin with the terms and conditions of the policy itself. * * * If the term at issue is not defined in the policy, the next step is to look to the plain meaning of the term. * * * If there is more than one plausible interpretation of the term's plain meaning, each interpretation must be scrutinized in the light of the specific context in which the term is used in the policy and also in the broad context of the policy as a whole.* * * If, after scrutiny, both proffered interpretations remain reasonable, the rule of interpretation against the drafter applies." *Baumann v. North Pacific Ins. Co.*, 152 Or App 181, 186, 952 P2d 1052, *rev den* 327 Or 621 (1998).

The dispositive issue on plaintiff's first assignment of error is the meaning of the policy term "covered expenses." The policies define covered expenses as "regular business expenses which you normally incur in the conduct of your business or profession[.]" Because the term "covered expenses" is defined in the policies, that meaning controls: to be covered, the expenses must be incurred by plaintiff in the *conduct* of his business. The policy does not further define the word "conduct." However, the word does have a plain meaning in this context; namely, to describe "the act, manner, or process of * * * *carrying forward* (as a business* * *)." *Webster's Third New Int'l Dictionary,* 473 (unabridged ed 1993) (emphasis added). Moreover, in order to be covered, expenses must be incurred in "your" (the insured's) business. Thus, the plain meaning of the policies' definition of covered expenses shows the intention that the insured must actually be in business in order to incur covered expenses.

Although not controlling, case authority from other jurisdictions supports our interpretation of the plain meaning of the term "covered expenses." In *Wilson v. Monarch Life Insurance Company,* 971 F2d 312 (9th Cir 1992), the court interpreted a business overhead expense policy that covered "the usual overhead expenses you have in running your office or business." *Id.* at 313. There, after the plaintiff became disabled he sold his chiropractic practice, retaining the right to collect on all accounts receivable through the date of the sale. *Id.* The plaintiff argued that he continued to incur overhead expenses in the account collection process despite the sale of his business. The Ninth Circuit disagreed, concluding, that having sold his practice, "[u]nder these circumstances, he no longer was 'running' his office or business." *Id.* While not identical, the policy language at issue in *Wilson* was similar to the requirement in plaintiff's policies that covered expenses be incurred in the "conduct" of his profession. Here, as in *Wilson*, plaintiff did not "conduct" his practice after the sale.

Plaintiff argues that the policy provisions in this case are more analogous to those at issue in *Lincoln Dental Arts Clinic v. Mutual Life Insurance Company of New York*, (ND Ill 1993) (1993 WL 239020) (mem), than they are comparable

to the provisions examined in *Wilson*. In *Lincoln Dental Arts Clinic*, the insured owned a 50 percent interest in the corporation through which he conducted his dental practice. The insured sold his stock to the corporation before the 90-day exclusion period in his overhead expense policy expired. The insured's policy, as did those at issue here, made no provision for a change in business ownership. The policy covered expenses "you incur." However, the policy definition of "overhead expenses" hinged on the insured's ownership interest *at the start of the disability*.[2] Because the insured had an ownership interest in the corporation at the time he became disabled, the court concluded that the policy covered expenses incurred after the sale of his stock. Furthermore, the court distinguished *Wilson* because that case involved a sole proprietor, whereas the plaintiff in *Lincoln Dental Arts* was the professional corporation of which the insured was only a 50 percent shareholder. Thus, the *plaintiff* was continuing the same business following the sale of the insured's stock. In contrast, the policies that plaintiff purchased in this case do not look to circumstances existing at the commencement of plaintiff's disability in order to determine coverage. Rather, they require that the expenses be incurred in the "conduct" of the practice. Moreover, plaintiff was the sole shareholder of the corporation before the sale of his stock to Keys. Therefore, *Lincoln Dental Arts Clinic* is factually distinguishable from this case.

Plaintiff argues that *Wilson* is also distinguishable, because in that case the doctor had not reserved rights in the business as a pledgee of the transferred stock, as plaintiff did here. *See Investment Service v. Martin Bros.*, 255 Or 192, 204, 465 P2d 868 (1970) (pledgee retains interest in pledged instrument). Plaintiff draws our attention to language in a Guardian pamphlet stating that applicants must have an ownership interest of at least 20 percent in the business or else have a "contractual obligation." Plaintiff's arguments miss the mark. While a pledgee of stock has a collateral interest in the stock as a secured creditor, that interest does not

---

[2] The policy definition provided, in part:

"*If at the start of disability* [the insured is] an employee and shareholder of a corporation, we will consider as Covered Overhead Expenses incurred by you a percentage of the corporation's total Covered Overhead Expenses * * *." (Emphasis added.)

mean, either as an abstract proposition of law or, based on the undisputed facts in this case, that plaintiff conducted the business following the sale of his stock. It is undisputed that Keys operated and carried the practice forward after the sale. Moreover, the pamphlet plaintiff received does not make the otherwise plain language of the policies ambiguous. The pamphlet refers to two separate policy forms and does not specifically purport to describe the conditions of coverage for any particular overhead disability policy. Instead, the pamphlet refers the reader to other sources for "full details of coverage." While the pamphlet may be ambiguous in its cryptic reference to applicants "in general * * * [having] a contractual obligation," that reference does not make the plain language of the policies less certain.[3] We conclude that, under the plain meaning of the term "covered expenses," plaintiff did not conduct a business or profession after he sold his stock and, therefore, the policies did not cover his payment of overhead expenses.[4] Accordingly, Guardian did not breach its obligation under the policies to provide business overhead expense coverage and was entitled to summary judgment on that claim.

Plaintiff's second and third assignments of error challenge the dismissal on summary judgment of his claims against Guardian for violation of the Unfair Claims Settlement Practices Act, ORS 746.230, and bad faith denial of insurance coverage.

■ ■ Plaintiff's claim for violation of the Unfair Claims Settlement Practices Act was appropriately dismissed on summary judgment because violations of that act are not

---

[3] Plaintiff does not argue in his first assignment of error that the pamphlet formed a part of the policies or that its language estops Guardian from denying coverage. *See De Jonge v. Mutual of Enumclaw*, 315 Or 237, 241, 843 P2d 914 (1992) (estoppel may not create coverage not provided in the policy).

[4] *See also Paul Revere Life Insurance Company v. Klock*, 169 So 2d 493, 495 (Fla App 1964), *cert den* 173 So 2d 148 (Fla 1965) (dentist's office expenses not covered by business overhead expense policy where dentist had sublet the office space to doctor conducting unrelated practice in which dentist had no involvement); *Principal Mutual Life Ins. Co. v. Toranto*, (ND Tex 1997) (1997 WL 279751) (mem), *on recons in part* (ND Tex 1997) (1997 WL 361872) (mem) (surgeon no longer had overhead expenses following the sale of his practice under a disability policy covering surgeon's "share of the usual and customary monthly business expenses [he is] responsible for in the operation of [his] business").

independently actionable. *See Farris v. U.S. Fid. and Guar. Co.,* 284 Or 453, 458, 587 P2d 1015 (1978). His claim for bad faith denial of coverage is likewise foreclosed at the outset, because there was no coverage.[5]

In his fourth assignment of error, plaintiff argues that the trial court erred in dismissing on summary judgment his claim against Guardian for breach of the duty of good faith and fair dealing *solely* because the court had dismissed his breach of contract claim on summary judgment. In his fifth assignment of error, plaintiff contends that summary judgment on the good faith claim was precluded because there is a genuine issue of material fact as to whether Bailey had a duty to advise him of any coverage problems that could result from his sale of the practice. Plaintiff maintains that his good faith claim is independently viable, regardless of the disposition of his contract claim.

Plaintiff is correct that it is possible for an insurer to breach the duty of good faith without also breaching the insurance contract. *McKenzie v. Pacific Health & Life Ins. Co.,* 118 Or App 377, 380-81, 847 P2d 879 (1993), *rev dismissed* 318 Or 476 (1994). Here, plaintiff relies on the same facts that he alleges constituted a breach of the insurance contract. However, any implied covenant of good faith and fair dealing must be consistent with the terms of a contract, in this case the scope of coverage provided by the policies. *Uptown Heights Associates v. Seafirst Corp.,* 320 Or 638, 644-45, 891 P2d 639 (1995); *Wegroup PC v. State of Oregon,* 131 Or App 346, 353, 885 P2d 709 (1994). The covenant of good faith that plaintiff seeks to imply would be inconsistent with the coverage provisions of the policies. Therefore, we conclude that the trial court did not err in dismissing plaintiff's claim for breach of the duty of good faith and fair dealing.

Plaintiff next assigns error to the trial court's dismissal of his estoppel claim on summary judgment. Plaintiff asserts that Guardian is bound by Bailey's representation of coverage. Plaintiff asserts that estoppel overcomes the effect

---

[5] We do not suggest that such a claim would exist even if plaintiff had a viable claim for breach of contract. *See, e.g., Farris v. U.S. Fid. and Guar. Co.,* 284 Or at 458; *Warren v. Farmers Ins. Co. of Oregon,* 115 Or App 319, 326, 838 P2d 620 (1992), *rev den* 316 Or 529 (1993).

of an insured's conduct that would otherwise activate a condition forfeiting coverage. Plaintiff also argues that because, in his view, coverage existed by virtue of Bailey's representation before the date he sold his stock, his estoppel claim merely *preserves* coverage. The trial court agreed with Guardian that plaintiff's estoppel claim impermissibly sought to *expand*, rather than to preserve, coverage.

We first address plaintiff's assertion that, at most, the sale of his stock triggered a condition forfeiting further coverage of overhead expenses. The doctrine of estoppel may in appropriate circumstances be invoked to preclude an insurer from relying on a condition forfeiting coverage. *ABCD...Vision v. Fireman's Fund Ins. Companies*, 304 Or 301, 306, 744 P2d 998 (1987). "A condition of forfeiture exists when there is insurance coverage for the loss in the first place, but acts of the insured nullify the coverage * * *. A condition of forfeiture disallows claims that otherwise are covered under a policy." *Herman v. Valley Ins. Co.*, 145 Or App 124, 130-31, 928 P2d 985 (1996), *rev den* 325 Or 438 (1997). Examples of conduct by the insured that triggers a condition of forfeiture include the filing of a false statement, *ABCD...Vision*, 304 Or at 306; failure to protect the insured property, *id.*; vacating a building after issuance of a fire insurance policy, *Kabban v. Mackin*, 104 Or App 422, 429, 801 P2d 883 (1990); and failing to obtain the insurer's consent before settling a claim, *Federated Service Ins. Co. v. Granados*, 133 Or App 5, 8, 889 P2d 1312, *rev den* 321 Or 512 (1995). The unifying fact connecting each of those examples is an act of the insured that nullifies otherwise preexisting coverage.

Here, on the other hand, the policies never provided overhead expense coverage for a business that was not conducted by the insured. The policy provision at issue in this case limits the scope of coverage by requiring that the insured must conduct his business; it is not a condition forfeiting coverage, such as those examples listed above. *See ABCD...Vision*, 304 Or at 306.[6] Therefore, estoppel cannot

---

[6] Plaintiff's insistence that the sale of his business constituted an act invoking a condition of forfeiture demonstrates misunderstanding of the principle. The policies never provided coverage for expenses incurred in a business other than one conducted by the insured. Plaintiff's argument would have arguable merit if the

defeat the policy provision under the condition of forfeiture doctrine.

■ Plaintiff's estoppel theory does not rest on his condition of forfeiture argument alone. Plaintiff asserts that the principle that estoppel cannot create coverage where none previously existed does not apply where the claim is based on conduct of the insurer that occurred before the loss. *Paulson v. Western Life Insurance Co.*, 292 Or 38, 52-53, 636 P2d 935 (1981).[7] Plaintiff alleges that Bailey represented the possible existence of continued coverage in April while plaintiff was conducting negotiations for the sale of his practice. The date of plaintiff's loss, if any, under the policy was May 8, the date he was deemed totally disabled. Therefore, plaintiff reasons that estoppel merely preserved, at the date of loss, the coverage that Bailey represented to exist.

■ In order to prove estoppel, there must be evidence from which the trier of fact could find that

"(1) a false representation (albeit an innocent one) was made (2) by someone having knowledge of the facts to (3) one who was ignorant of the truth, (4) that the statement was made with the intention that it be acted upon by the plaintiff, and (5) that plaintiff acted upon it." *Id.; Collver v. Salem Insurance Agency, Inc.*, 132 Or App 52, 62 n 6, 887 P2d 836 (1994), *rev den* 320 Or 598 (1995).

Assuming, without deciding, that a pre-loss, post-loss distinction has any application to this case, there are two overriding problems with plaintiff's preservation of coverage argument

---

policy had provided coverage for expenses incurred by a successor owner and the insurer had contended that some later act of the insured or the successor vitiated that coverage. *See, e.g., Bennett v. Farmers Ins. Co.*, 150 Or App 63, 77, 945 P2d 595 (1997), *rev allowed* 327 Or 620 (1998) (where there is an express contract, courts cannot create a new contract for the parties by estoppel); *Boyer Metal Fab v. Maryland Casualty Co.*, 90 Or App 103, 107, 750 P2d 1195, *rev den* 305 Or 672 (1988) (estoppel may not be invoked to create coverage where none existed under the policy).

[7] The distinction between representations made before and after an event of loss has some foundation in decisions of this court and the Oregon Supreme Court. *See Kabban*, 104 Or App at 429; *Paulson*, 292 Or at 52-53. However, the validity of that distinction is limited in light of *DeJonge*, 315 Or at 244-45 (court declines to draw a distinction between pre-loss and post-loss conduct—applicable distinction for purposes of estoppel is between pre-*policy* and post-*policy* losses). *See also Bennett*, 150 Or App at 78.

in light of the elements he must prove in order to bind Guardian by estoppel. First, considering the evidence most favorable to plaintiff, Bailey made no definite, unequivocal representation to him about coverage before May 8. Each of plaintiff's affidavits on summary judgment recites that Bailey told him that coverage "might" or "could" be maintained under certain circumstances following a sale of the practice. Plaintiff alleges that Bailey later—*after* May 8— told plaintiff's attorney that coverage was "certain" under the sale documents. Thus, it is established that the first unequivocal representation of coverage is alleged to have occurred only after the date of the event triggering loss.

Second, plaintiff did not rely on any representation made by Bailey before May 8, his claimed date of loss. The stock purchase agreement was executed on May 23. Assuming without deciding that plaintiff and his attorney had any right to rely on Bailey's lay estimation of the prospects for coverage, there was no reliance in fact until the agreement was executed and plaintiff became obligated to pay Keys' overhead expenses. Therefore, we conclude that plaintiff's claim attempts to *expand* coverage based upon a representation allegedly made after that coverage was already fixed. The trial court did not err in dismissing plaintiff's estoppel claim on summary judgment.[8]

Plaintiff's seventh, eighth, and ninth assignments of error challenge the trial court's grant of summary judgment against him on claims against defendant Bailey. In his seventh assignment of error, plaintiff argues that the trial court erred in dismissing his negligence claim on the premise that Bailey had no duty to advise him with respect to potential coverage problems arising out of the sale of his practice.[9] Relying on the same reasoning, plaintiff's ninth assignment

[8] Plaintiff also argues that because the trial court did not grant summary judgment on the estoppel claim on defendant's first motion, it is the law of the case that a genuine issue of material fact existed with respect to estoppel, and it was therefore improper for the trial court to grant a later summary judgment motion on that claim. However, this argument is not preserved, as plaintiff did not present it to the trial court.

[9] Because of our disposition of plaintiff's seventh assignment of error, we need not separately discuss his eighth assignment of error, which contends that the trial court erred in dismissing his negligence claim against Bailey for want of a special relationship establishing Bailey's duties to plaintiff.

of error contends that Bailey violated a duty of good faith and fair dealing toward plaintiff by not properly advising him concerning coverage problems under the policies. Bailey counters that he had no duty to interpret plaintiff's preexisting coverage after the event triggering loss.

■ An insurance agent owes a duty of reasonable care to the insured in procuring and, in some cases, maintaining, appropriate coverage. *Kabban*, 104 Or App at 432-33. In *Kabban*, this court concluded that the plaintiff's evidence of a local practice to advise insureds about potential coverage problems before the occurrence of loss was significant to the duty analysis and was sufficient to create a jury question. *Id.* at 433. This case, however, does not present a similar problem of procuring or maintaining coverage. As discussed above, giving plaintiff the benefit of every reasonable inference, the evidence shows that, before the onset of his total disability, Bailey recommended that he keep his existing policies following the sale because they *might* provide coverage for overhead expenses. That statement, if made, was neither an affirmative representation that coverage *would* continue nor did it create any additional risk to plaintiff. Bailey did not advise plaintiff to sell his practice. Plaintiff's health was deteriorating rapidly at the time of his first discussions with Bailey in April. His own affidavit establishes his urgent need to sell his practice as a going concern in order to preserve its value. At most, by following Bailey's pre-loss recommendation that he retain the policies, plaintiff was exposed to the risk of paying premiums for coverage that would be of no further use to him should Guardian deny coverage for the expenses following the sale.

■ This case is unlike *Kabban* and cases of its kind because those cases all involved an increased risk of uninsured loss to the insured by reason of the agent's conduct before the occurrence of the event of loss. Here, on the other hand, before May 8, Bailey merely offered the possibility of preserving coverage without any corresponding increase in risk that coverage would be lost. Furthermore, the final decision on structuring the stock sale occurred after plaintiff's attorney called Bailey on May 20[10]—*after* plaintiff was

_____

[10] Although Plaintiff's attorney testified in his deposition that he did not seek a legal interpretation of the policies from Bailey that coverage would exist following

deemed totally disabled on May 8. There was no evidence that Bailey's alleged statement on May 20 that the expenses would be covered was made under a contractual or agency-based duty to preserve coverage for plaintiff. A standard foreseeability analysis does not apply to the duty of an agent toward an insured. Any applicable agency or contractual relationship defines that duty. *Nofziger v. Kentucky Central Life Insurance Co.*, 91 Or App 633, 639-40, 758 P2d 348, *rev den* 306 Or 527 (1988). We find no authority supporting the imposition of a duty on an insurance agent to confirm or evaluate the insured's attorney's advice about the prospects for coverage *after* the event triggering loss occurs and no change in coverage may be effected. We decline to do so now. Under the circumstances, the trial court properly granted summary judgment in favor of Bailey on both plaintiff's negligence and breach of the covenant of good faith and fair dealing claims on the ground that Bailey did not breach any duty to procure or maintain coverage on plaintiff's behalf.

■　Plaintiff's final assignment of error asserts that the trial court erred in dismissing his intentional infliction of emotional distress claim against both defendants on summary judgment. Bailey responds that plaintiff failed to establish that his conduct fulfilled the elements of intentional infliction of emotional distress. Guardian agrees and further contends that, even if Bailey's conduct *did* constitute intentional infliction of emotional distress, the evidence does not justify the imposition of vicarious liability on Guardian.

■　To establish a claim for intentional infliction of emotional distress, plaintiff must show first that Bailey "desire[d] to inflict severe emotional distress, and also * * * [knew] that such distress [was] certain, or substantially certain, to result from his conduct." *McGanty v. Staudenraus*, 321 Or 532, 550, 901 P2d 841 (1995). Plaintiff must also show that defendants' acts amounted to an extraordinary transgression of the bounds of socially tolerable conduct. *Id.* at 543. Plaintiff argues that the outrageousness of Bailey's conduct is aggravated by the existence of a special relationship between an

---

a sale of plaintiff's stock, the attorney testified that he wanted Bailey to tell him whether there was a likelihood of coverage and whether Guardian was a reliable company. The attorney denied that his purpose in contacting Bailey was to bind the defendants to a legal position.

insurer and an insured, citing *Crosby v. SAIF*, 73 Or App 372, 699 P2d 198 (1985). *Crosby* involved an allegation of civil conspiracy against the insurer. *Id.* at 374. Bailey's actions do not even come close to that level of egregiousness. Viewing the evidence in the light most favorable to plaintiff, there is no evidence from which to infer that Bailey intended to inflict severe emotional distress on plaintiff. At most, Bailey gave plaintiff's lawyer his opinion that overhead expense coverage would continue after plaintiff sold his practice if the stock sale agreement were properly drafted and recommended that plaintiff keep the policies in effect. Such conduct, however mistaken, did not constitute intentional infliction of emotional distress. We agree with the trial court that plaintiff's argument fails on the issues of Bailey's intent and the level of offensiveness of the conduct. Consequently, we conclude that the trial court properly dismissed that claim against both defendants on summary judgment.

Affirmed.